IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 17-301 |
| | ) | |
| DAVID FRANCIS | ) | |

**RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO MODIFY CUSTODY FROM THE ALLEGHENY COUNTY JAIL
TO PRE-TRIAL RELEASE/HOUSE ARREST**

AND NOW, comes the United States of America, by and through Scott W. Brady, United

States Attorney for the Western District of Pennsylvania, and Tonya Sulia Goodman, Assistant

United States Attorney for said district, and respectfully files the following Response in

Opposition to Defendant's Motion to Modify Custody from the Allegheny County Jail to Pre-

Trial Release/House Arrest. (Doc. No. 200.) As explained below, the COVID-19 pandemic does

not present a compelling reason to release the Defendant, who poses a danger to the community,

and has been charged with six felony drug offenses, including three counts of distributing heroin

and fentanyl which resulted in serious bodily injury to three separate victims. (*See* Doc. No. 76.)

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

A.     <u>**Background of This Case**</u>

1.     On October 6, 2017, Defendant David Francis was charged by a Criminal

Complaint, issued by United States Magistrate Judge Lisa Pupo Lenihan, with one count of

possession with intent to distribute a quantity of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1)

and 841(b)(1)(C). (*See* Doc. No. 1 at Case No. 17-1256M.) The Government moved for pretrial

detention of the Defendant and the court scheduled a detention hearing for October 11, 2017,

before United States Magistrate Judge Robert C. Mitchell.

2.     At the detention hearing on October 11, 2017, the Government proffered the

Criminal Complaint and the attached Affidavit in Support of Criminal Complaint and Arrest Warrant (hereinafter, "Affidavit") as a finding of probable cause in the case and also as evidence of dangerousness. (*See* Transcript of Proceedings on October 11, 2017 (hereinafter, "Transcript") at 2.) The Government also proffered the report prepared by the United States Probation and Pretrial Services Office. (*Id*.)

3.     The Government then presented the testimony of Special Agent Tom Mignogna of the Drug Enforcement Administration ("DEA"). Agent Mignogna began by testifying about his background and experience as a DEA agent. (*See* Transcript at 5.) Agent Mignogna testified that he personally participated in this investigation, including being assigned to the team that executed a search warrant at the Defendant's residence on October 6, 2017. (*Id*.) Agent Mignogna then provided testimony about evidence in the case which linked the Defendant to heroin and/or fentanyl overdoses. (*See* Transcript at 6, 8, 22, 24-25.) He testified that the victim of an overdose in September 2017 identified the Defendant as the person who had supplied the drugs which caused the overdose. (*Id*. at 7.) Agent Mignogna further testified that stamp bags were collected from the scene of that overdose and that those bags, which were stamped with a skull, matched stamp bags recovered from the scene of a separate overdose, which occurred in July 2017. (*Id*.) Agent Mignogna testified that the same skull stamp bags were also recovered from the Defendant's residence at 901 Chartiers Ave. on the day of the search warrant, October 6, 2017. (*Id*. at 21, 25.) Agent Mignogna also testified that another overdose victim stated that he/she had overdosed approximately five times as a result of drugs that the Defendant had supplied to him/her. (*Id*. at p. 8.)

4.     Agent Mignogna then provided testimony about evidence recovered during a

forensic examination of the Defendant's cell phone and the Government admitted into evidence several exhibits related to that forensic examination. (*Id*. at 9-15.) Agent Mignogna testified about two text messages recovered from the Defendant's cell phone. (*Id*. at 9-13.) Based upon his experience as a DEA agent, Agent Mignogna interpreted the content of the text messages and testified that the communications were drug-related. (*Id*.) Agent Mignogna also testified about the drug-related internet browsing history recovered from the Defendant's cell phone. (*Id*. at 13-14.) Agent Mignogna also provided testimony about the search warrants executed on October 6, 2017. (*Id*. at 5-6, 15-25.) He testified that agents made entry into the facility at 641 Broadway Ave., which was a purported drug rehabilitation facility run and owned by the Defendant. (*Id*. at 15.) Agent Mignogna testified that when agents made entry into 641 Broadway Ave., they observed several individuals shooting suspected fentanyl. (*Id*. at 15-16.) The Government admitted into evidence two photographs taken inside of 641 Broadway Avenue on the day the search warrant was executed. (*Id*. at 16-17.) Agent Mignogna further testified that the individuals injecting inside of 641 Broadway told the agents that the Defendant had supplied them with the drugs they had been using that day. (*Id*. at 18.) The Defendant did not present any evidence at the detention hearing, but his attorney made arguments in support of his request for release. (*Id*. at 29-32.)

5.    Based upon all of the foregoing, Magistrate Judge Mitchell granted the Government's request for detention and ordered that the Defendant be detained pending trial. (*Id*. at 32-33; *see also* Order of Detention, Doc. No. 9 at Case No. 17-1256M.) Magistrate Judge Mitchell concluded that "the statutory presumption of danger to the community and risk of flight [had] not been rebutted . . .". (*See* Transcript at p. 33.)

6.    On October 30, 2017, the Defendant filed a Motion for Revocation of Order of

Detention. (*See* Doc. No. 11 at Case No. 17-1256M.) On November 2, 2017, this Honorable Court scheduled a hearing on the Defendant's motion for November 7, 2017. One day prior to the entry of the Court's Order, on November 1, 2017, the grand jury returned a one-count Indictment, charging the Defendant with one count of possession with intent to distribute a quantity of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (*See* Doc. No. 14.) Arraignment was scheduled for November 8, 2017. Given the Indictment and pending arraignment, on November 3, 2017, the Defendant filed a motion to withdraw his motion for revocation of order of detention. (*See* Doc. No. 17.) On the same day, the Defendant also filed a consent motion to reschedule the arraignment, due to defense counsel's unavailability, and the arraignment was rescheduled to November 13, 2017. (*See* Doc. Nos. 18, 20.) On November 6, 2017, this Court granted the Defendant's motion to withdraw his motion for revocation of order of detention and the Defendant's motion was immediately withdrawn. (*See* Doc. No. 19.)

7.      On November 9, 2017, the defendant filed a Consent Motion for Detention Hearing. (*See* Doc. No. 21.) On November 13, 2017, Magistrate Judge Mitchell arraigned the Defendant on the charge in the Indictment and a detention hearing was scheduled for the following day, November 14, 2017. On November 14, 2017, Magistrate Judge Mitchell also formally ruled on the Defendant's Consent Motion for Detention Hearing and issued an order scheduling the detention hearing for 1:45 p.m. later that same day. (*See* Doc. No. 22.) However, at the scheduled detention hearing on November 14, 2017, Magistrate Judge Mitchell ruled that because the Defendant already had a detention hearing in Magistrate Court and because an Order of Detention had already been issued, the Defendant was not entitled to a second detention hearing in Magistrate Court, but, rather, would have to appeal the Order of Detention to the District Court. (*See* Doc. No. 29.) The

Defendant remained detained and a hearing on the Defendant's appeal of the Order of Detention was scheduled before this Court on November 29, 2017 at 10:00 a.m.

8.    On November 28, 2017, one day before the scheduled detention hearing, the Defendant filed Defendant's Memorandum in Opposition to the Government's Request for Detention and a Renewed Motion for Revocation of Order of Detention (Appeal from order of Magistrate Judge). (*See* Doc. Nos. 30, 31.[1]) In his Renewed Motion for Revocation of Order of Detention (Appeal from order of Magistrate Judge), the Defendant renewed his request for revocation of the Order of Detention. (*See* Doc. No. 31.)

9.    At the detention hearing on November 29, 2017, the Defendant sought to proffer the arguments and conclusions in his Memorandum in Opposition to the Government's Request for Detention (hereinafter, "Defendant's Memorandum") (Doc. No. 30) as substantive evidence presented to rebut the statutory presumption. The Government objected to the Defendant's attempt to proffer his arguments and conclusions as substantive evidence in the case, given that many of the statements set forth in the Defendant's Memorandum were nothing more than conclusory and unsupported averments, some of which are directly contradicted by the Government's evidence in this case. The Court granted the Defendant's request to continue the detention hearing and it was rescheduled for December 20, 2017. (*See* Doc. No. 35.)

10.    On December 6, 2017, the Government filed the Government's Reply to Defendant's Memorandum in Opposition to the Government's Request for Detention, opposing the Defendant's request for release on bond in this case. (*See* Doc. No. 37.) The detention

---

[1] Pursuant to LCrR 12D, the Government was entitled to a period of 14 days to file its response to the Defendant's pleadings.

hearing began on December 20, 2017 before this Court. DEA Task Force Officer Thomas Dunlevy testified on behalf of the Government at the detention hearing and the Government entered several exhibits into evidence. Due to scheduling conflicts, the parties were not able to complete the testimony on December 20, 2017, and the Court continued the hearing for further proceedings on December 27, 2017. (*See* Doc. No. 40.) Task Force Officer Dunlevy's testimony continued on December 27, 2017, followed by cross and redirect examination. The Defendant did not present witnesses, but made arguments in favor of release.

11. At the conclusion of the detention hearing, the Court ordered that the Defendant remain detained pending trial. (*See* Doc. No. 43.) The Court found that although the Defendant presented sufficient evidence to rebut the presumption as to risk of flight and found insufficient evidence to show risk of flight, the Government met its burden to show by clear and convincing evidence that the Defendant posed a danger to community. (*Id*.) On January 18, 2018, the Court issued an Opinion (hereinafter, "the Court's Opinion"), formally denying the Defendant's request for release and ordering that the Defendant remain detained pending trial. (Doc. No. 46.) The facts elicited by the Government over the course of the two days of the detention hearing proceedings are voluminous, and they are set forth with exacting detail by this Court in the Court's Opinion. The Government does not deem it necessary or productive, therefore, to recite those facts anew herein.

12. In the Court's Opinion, this Court set forth in detail the factors supporting the Court's order of continued detention. First, the Court found that, based upon the grand jury's Indictment, charging a violation of 21 U.SC. §§ 841(a)(1) and 841(b)(1)(C), there was probable cause to believe the Defendant committed an offense that falls within the category of offenses

listed in § 3142(e)(3)(A), giving rise to a rebuttable presumption that no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of the community. (*See* Doc. No. 46 at 7.) The Court then conducted a thorough review of the factors set forth at 18 U.S.C. § 3142(g). With respect to the first factor listed in § 3142, the nature and circumstances of the offense charged (§ 3142(g)(1)), this Court found, "the evidence adduced [at the detention hearing] weigh[ed] strongly in favor of defendant being detained pending trial." (*Id*. at 10.) With respect to the weight of the evidence against the defendant (§ 3142(g)(2)), the Court concluded that "the weight of the evidence against defendant is very strong with respect to the possession with intent to distribute heroin charge. This factor, therefore, weighs strongly in favor of defendant being detained pending trial." (*Id*. at 11.) As to the history and characteristics of the Defendant (§ 3142(g)(3)), the Court noted that although the Defendant presented evidence that he has strong community ties to the Western District of Pennsylvania and his family, family and community ties have limited weight in the context of assessing whether a defendant presents a danger to the community, as opposed to assessing the risk of flight. (*Id*. at 11-12.) With respect to the Defendant's employment, the Court noted that the Defendant's businesses, which otherwise might provide a measure of stability, were tied to illegal activity involving drug trafficking. (*Id*. at 12.) The Court also cited the "scheme by defendant" which "employed the use of letters addressed to judges and probation offices, purporting to be from the nonprofit Next Step Foundation under defendant's signature, in order to provide recovery service 'plans' or work schedules to support pretrial release of these individuals." (*Id*. at 13.) As to the nature and seriousness of the danger to any person or the community that would be posed by the Defendant's release (§ 3142(g)(4)), the Court felt

constrained to conclude, based upon the record presented, that the Defendant was likely to continue to traffic drugs if released pending trial. (*Id*. at 15.) With respect to risk of flight, the Court found that the Government did not meet its burden of proving by a preponderance of the evidence that Defendant posed a risk of flight. (*Id*.) After carefully weighing all of the factors set forth at 18 U.S.C. § 3142, this Court concluded,

> The court upon consideration of all the relevant factors, including the seriousness of the offense, the weight of the evidence, the history and characteristics of the defendant, the danger he poses to the community, and the presumption, which retains evidentiary weight in any event, determined that these factors ***weigh strongly in favor of detention*** in this case particularly because it is likely he will continue to traffic in drugs. In other words, the court finds that even assuming defendant had rebutted the § 3142 presumption as to danger to the community, under the totality of the evidence presented, the government presented by clear and convincing evidence that the defendant presents a danger to the community and there are no conditions or set of conditions that will ensure the safety of the community if defendant is released pending trial.

(*Id*. at 16.) (emphasis added.)

13.     On April 13, 2020, the Defendant filed the present motion (Doc. No. 200), arguing for his release from detention at the ACJ, given the COVID-19 pandemic.

**B.     COVID-19 and The ACJ**

14.     The Government recognizes that COVID-19 carries an increased risk of transmission; carries a higher fatality rate than many other viruses; and has resulted in a state of emergency. Accordingly, the ACJ has taken substantial steps to prepare for this crisis. The ACJ has issued a COVID-19 alert on its webpage, which explains:

> The Bureau of Corrections is charged with providing for the care, custody and control of persons committed to the Allegheny County Jail. Confined areas present challenges when it comes to mitigation and elimination of the spread of illness or disease, and COVID-19 is no exception.
>
> On March 13, 2020, we made the decision to restrict social and professional

visits. On March 27, we announced that one of our staff members had a confirmed case of COVID-19. And while that individual did not have direct inmate contact, we also stepped up our response implementing additional measures including active screening for fever and respiratory symptoms in staff, contractors, inmates and individuals coming into the facility at intake. And with the Court's approval, we also began restricting legal visits, setting up alternative ways for individuals to communicate with their attorneys.

Additionally, we have increased the availability of authorized cleaning agents effective at disinfecting the virus, as well as regularly scheduled mandatory cleaning sessions across the entire facility. And while there are no restrictions for out-of-cell time due to COVID-19 concerns, we are encouraging physical distancing to employees and inmates across the facility. Educational materials are posted across the jail, and town hall meetings have been held on each pod to discuss frequent cleaning and physical distancing. Every housing unit has been appropriately supplied with bars of soap to increase hand washing and hygiene among the population. All pods are now on quarter recreation to reduce the potential interactions there. In order to mitigate the effects of no outside contact, inmates are being allowed one free daily five-minute phone call.

We continue to work closely with the Health Department and follow guidance from their team, as well as that provided by the PA Department of Health, the PA Department of Corrections and the CDC.

The health, safety and welfare of the inmates and our staff remains our biggest priority. We are deeply indebted to, and salute, our healthcare and corrections staff who are working tirelessly to care for those in our custody. We recognize the commitment, dedication and sacrifices that represents, and remain grateful for everything that they do.

https://www.alleghenycounty.us/jail/index.aspx (last visited April 15, 2020). The ACJ further

reports that as of April 15, 2020, four inmates and one staff member have tested positive for the

COVID-19 virus. *Id.*

15.     With respect to the ability of an attorney to communicate with a client

incarcerated at the ACJ, the statement on the website instructs,

Attorney visits have been temporarily suspended, although attorney/client phone calls will be provided. In order to guarantee the confidentiality of these calls, a "Legal Privacy Request Form" has been created which may be obtained by emailing the Courts at PrivacyRequest@alleghenycourts.us along with a copy of

the attorney's license card to verify their identity. Attorneys should fill out the form and email it to the jail as per the instructions to ensure that their calls are not recorded. The form also contains contact information for any questions regarding this process.

*Id.* The Government is also aware that officials at the ACJ are diligently working to provide video conferencing to federal inmates for court appearances, including allowing time before those appearances for inmates to consult privately with their counsel. The Government has also learned, through discussions with Bill Mistick, Population Control Manager and Video Administrator at the ACJ, that the ACJ offers confidential video conferencing for inmates and their attorneys. The ACJ has nine rooms dedicated to this video conferencing, and has been accommodating numerous conferences per day.

16.    Moreover, measures undertaken by other stakeholders will also serve to further reduce the risk of a COVID-19 outbreak at the ACJ. For example, local courts have made efforts to reduce the movement of prisoners in and out of the ACJ. In federal court, Chief Judge Hornak's Administrative Order postponed all federal criminal trials scheduled to commence through April 27, 2020. (Misc. No. 2:20-mc-394-MRH.) Nearly every other District Court Judge in this Courthouse has issued similar orders continuing criminal proceedings. Moreover, pursuant to an Order of Court issued by Allegheny County Court of Common Pleas President Judge Kim Berkeley Clark, "Until further Order of Court, no inmates or juveniles will be transported from state correctional facilities, county jails or prisons, Shuman Detention Center, or Hartman Shelter." *See* Order of Court, Court of Common Pleas Allegheny County, No. AD - 2020 - __PJ. All of these measures serve to substantially reduce the movement of prisoners in and out of the ACJ, thereby reducing the risk of a COVID-19 outbreak.

17.     While it is true that some inmates are being considered for release from the ACJ in response to COVID-19, those releases are focused on non-violent offenders and inmates with medical infirmities. *See* https://www.wtae.com/article/release-of-up-to-100-allegheny-county-jail-inmates-a-day-under-way-as-coronavirus-precaution/31787878 (last visited April 15, 2020).

## II.     ARGUMENT

### A.  Relevant Law

18.     The Defendant is not contesting that he has been lawfully detained under the provisions of 18 U.S.C. § 3142.   Rather, he seeks an amendment of this Court's detention order, under 18 U.S.C. § 3145(b), to permit the Defendant to be released to house arrest/on conditions of release. In his request for release, the Defendant cites (1) the general health and safety concerns posed by COVID-19 at the ACJ; (2) his pre-existing health conditions (severe arthritis, Hepatitis C, and a necessary second hip replacement) and the fact that he is 69 years old; and (3) current restrictions in place at the ACJ limiting his attorney's contact with him at the ACJ. (*See* Doc. No. 200.)

19.     As an initial matter, the Defendant has no remedy for review of his order of detention under 18 U.S.C. § 3145(b). This provision of the Bail Reform Act provides,

> Review of a Detention Order.—
> If a person is ordered detained by a magistrate judge, or by a person ***other than a judge of a court having original jurisdiction over the offense*** and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly.

18 U.S.C. § 3145(b) (emphasis added). The Defendant has been ordered to be detained by this Court, which has original jurisdiction over the offense. The Defendant, therefore, has already exhausted his remedies pursuant to 18 U.S.C. § 3145(b), through his appeal of Magistrate Judge

Mitchell's detention order to this Court. Instead, the Defendant's request is governed by 18 U.S.C. § 3145(c), which instructs,

> An appeal from a release or detention order, or from a decision denying revocation or amendment of such an order, is governed by the provisions of section 1291 of title 28 and section 3731 of this title. The appeal shall be determined promptly. A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

20. To the extent, however, that the Defendant's request may be considered to be a request for temporary release pursuant to 18 U.S.C. § 3142(i), the Government will address the merits of the Defendant's motion herein.

21. This Honorable Court has ruled on several similar requests by defendants seeking release from detention in light of the COVID-19 pandemic. *See United States v. Sharrod Green*, Criminal No. 19-85, Opinion, Doc. No. 46 (W.D. Pa. Mar. 27, 2020); *United States v. Deontre Simpson*, Criminal No. 19-197, Opinion, Doc. No. 54 (W.D. Pa. Mar. 27, 202); *United States v. Leah Fiumara*, Memorandum Opinion, Criminal No. 15-94 (W.D. Pa. Mar. 30, 2020), *United States v. Montay Clancey*, Opinion, Criminal No. 19-329 (W.D. Pa. Apr. 1, 2020). In each of these cases, this Honorable Court denied the defendants' requests for release, acknowledging the defendants' potential for exposure to the COVID-19 virus at the ACJ, but also recognizing the following: (1) the ACJ is taking measures to address COVID-19; (2) the defendants also have a risk of contracting the disease in the community; and (3) the circumstances do not outweigh the original reasons for detention for each defendant.

22. Defendants Deontre Simpson and Sharrod Green, like defendant David Francis, are pending trail, having not yet entered pleas of guilty. So, the procedural posture of their cases is

12

identical to that of the Defendant here. Also similarly, in his motion for release from the ACJ, Sharrod Green cited his documented history of asthma, arguing that he was at heightened risk with respect to COVID-19. *Green*, Criminal No. 19-85, Emergency Motion for Release Pending Trial In Light Of Covid-19 Pandemic, Doc. No. 39, at 4 (W.D. Pa. Mar. 20, 2020). The Court's Opinion in *Green*, therefore, is particularly instructive here. In *Green*, this Court stated,

> The Court recognizes the potential for Green's exposure to the COVID-19 virus at the Allegheny County Jail ("ACJ"). Unfortunately, that potential exists anywhere in the community. As explained in detail by the government in its response, the ACJ, along with this court and other local authorities, have taken the necessary steps and precautions to help stop the spread of the COVID-19 virus amongst the population of Allegheny County, including those individuals detained in the ACJ. As of the date of this opinion and order, the COVID-19 virus has not been detected at the ACJ. Additionally, there is no indication that Green's medical needs are not being addressed at the ACJ; in fact, he is seemingly receiving appropriate medical care. While the Court is sympathetic to Green's medical concerns and claims regarding possible complications caused by the COVID-19 virus, such speculation concerning possible future conditions does not constitute a "compelling reason" for temporary release. In other words, Green's current arguments for release do not outweigh the factors considered by the magistrate judge in ordering his detention.

Criminal No. 19-85, Opinion, Doc. No. 46, at 3. At the time of the Court's opinion in *Green*, the ACJ had no documented cases of COVID-19. As noted above, however, four inmates and one staff member at the ACJ have since tested positive for the virus. The Government believes, nonetheless, that those statistics should not change the Court's analysis.

23.     Moreover, this Court's Opinions in the above-cited cases are consistent with an ever-growing lists of similar decisions by other Judges in this District. *See, e.g. United States v. Saxton-Smith*, Criminal No. 19-190, Doc. No. 352 (W.D. Pa. Mar. 27, 2020) (Horan, J.); *United States v. Crute*, Criminal No.19-299, Doc. No. 37 (W.D. Pa. Mar. 26, 2020) (Stickman. J.); *United States v. Colaianni*, Criminal No. 19-352, Doc. No. 40 (W.D. Pa. Mar. 26, 2020) (Stickman. J.); *United States v. Smith*, Criminal No. 19-351, Doc. No. 39 (W.D. Pa. Mar. 25, 2020) (Schwab, J.);

*United States v. Penney*, Criminal No. 19-8, Doc. No. 1795 (W.D. Pa. Mar. 18, 2020) (Ranjan, J.);

*United States v. Henderson*, Criminal No. 18-18, Doc. No. 67 (W.D. Pa. Apr. 13, 2020) (Hornak,

M.); *United States v. Loveings*, Criminal No. 20-51, Doc. No. 73 (W.D. Pa. Mar. 30, 2020) (Horan,

M.); *United States v. Pritchett*, Criminal No. 19-280, Doc. No. 42 (W.D. Pa. Apr. 2, 2020)

(Ambrose, D.); *United States v. Parker*, Criminal No. 19-173, Doc. No. 1137 (W.D. Pa. Apr. 1,

2020) (Stickman, W.); *United States v. Hall*, Criminal No. 15-87, Doc. No. 3116 (W.D. Pa. Apr.

7, 2020) (Fischer, N.); *United States v. Folks*, Criminal No. 18-1, Doc. No. 76 (W.D. Pa. Mar. 30,

2020) (Fischer, N.); *United States v. Jones*, Criminal No. 19-249, Doc. No. 50 (W.D. Pa. Mar. 29,

2020) (Dodge, P.); *United States v. Brown*, Criminal No. 18-77, Doc. No. 70 (W.D. Pa. Apr. 9,

2020) (Bissoon, C.); *United States v. Bastianelli*, Criminal No. 17-305, Doc. No. 164 (W.D. Pa.

Mar. 27, 2020) (Fischer, N.); *United States v. Thomas*, Criminal No. 19-176, Doc. No. 38 (W.D.

Pa. Mar. 31, 2020) (Horan, M.); *United States v. Love*, Criminal No. 19-301, Doc. No. 51 (W.D.

Pa. Apr. 3, 2020) (Fischer, N.); *United States v. Harris*, Criminal No. 19-172, Doc. No. 47 (W.D.

Pa. Mar. 31, 2020) (Stickman, W.); *United States v. Bennett*, Criminal No. 19-123, Doc. No. 45

(W.D. Pa. Mar. 27, 2020) (Kelly, M.).

24. Further, similar to this Court's decision in *Green*, other Judges in this District have

also denied motions for release, even where defendants have documented pre-existing medical

conditions, which may place them at higher risk for the COVID-19 virus. For example, in *United

States v. Jackson*, although the defendant had a documented history of severe asthma, Senior

United States District Judge Donetta W. Ambrose wrote:

> Defendant invites me to speculate that COVID-19 is present or imminent in the
> Allegheny County Jail and, therefore, that his health conditions justify the extreme
> measure of releasing him to home detention pending sentence. I do not agree that
> such a release is warranted by the facts of this case, or the actual circumstances at

the jail. Although I recognize the potential for exposure, that potential unfortunately exists anywhere in the community. Moreover, the Allegheny County Jail, along with this Court and all local authorities, have taken necessary steps and precautions to help stop the spread of COVID-19 among our local population, as well as the jail.

Criminal No. 18-216, Memorandum Opinion and Order Denying Application for Emergent Release on Conditions, Doc. No. 237, at 3-4 (W.D. Pa. Mar. 24, 2020). Similarly, although the defendant in *Crute* has Type-2 diabetes, in denying his motion for release, the Honorable William S. Stickman, IV reasoned:

> The Court recognizes the potential for Crute's exposure to the COVID-19 virus at the Allegheny County Jail ("ACJ"). Unfortunately, that potential exists anywhere in the community. As explained in detail by the government in its Response, the ACJ, along with this Court and other local authorities, have taken the necessary steps and precautions to help stop the spread of the COVID-19 virus amongst the population of Allegheny County, including those individuals detained in the ACJ. As of the date of this Order, the COVID-19 virus has not been detected at the ACJ. Additionally, there is no indication that Crute's medical needs are not being addressed at the ACJ; in fact, he is seemingly receiving appropriate medical care. While the Court is sympathetic to Crute's medical concerns and claims regarding possible complications caused by the COVID-19 virus, such speculation concerning possible future conditions does not constitute a "compelling reason" for temporary release.

Criminal No. 19-299, Doc. No. 37, at 3.

25.     In addition to the long list of COVID-19 opinions issued by the District Court here, the Third Circuit Court of Appeals has also weighed in on the issue. The Court recently denied an Appellant's Emergency Motion for Bail Pending Appeal Due to Coronavirus Risk, stating that "Appellant may renew the Emergency Motion **if he is diagnosed with COVID-19**." *United States v. Davis*, Criminal No. 19-1604, Doc. No. 50 (emphasis added).

26.     In denying defendants' requests for release, the District Courts have also considered factors beyond each defendant's individual circumstances. The Courts have also considered

whether a defendant's release would put a strain on the probation officer and courts and whether the defendant's release would increase COVID-19 risks to others. *See, e.g.*, *Jackson*, Criminal No. 18-216, Doc. No. 237, at 4; *United States v. Clark*, 2020 WL 1446895, Case No. 19-40068-01-HLT, *8 (D. Kan. March 25, 2020). In denying the defendant's request for release, with respect to increasing COVID-19 risk to others, the court in *Clark* remarked,

> [S]upervising such a high-risk offender out in the community will place pretrial services officers at heightened risk of contracting the virus. Location monitoring is not a limitless resource, nor is its installation and monitoring by the United States Pretrial Services officers without risk to those personnel (who must be trained and certified to install location monitoring) given the current recommendations regarding implementation of social distancing. And, when Mr. Clark violates his conditions of release (as he likely will), law enforcement officers will be forced to expend valuable resources during a national crisis to take him back into custody in Chicago and return him to the District of Kansas, both increasing the risk to them of contracting and spreading COVID-19 and further increasing the risk to the prison population when he inevitably returns to the facility.

Clark, 2020 WL 1446895, at *8 (internal quotation marks and citations omitted).

### B.  The Defendant Has Not Demonstrated that He is Entitled to Release under Prevailing Law

27.  Defendant David Francis has failed to meet his burden to show a compelling reason for temporary release from the ACJ.[2]

28.  As demonstrated above, the ACJ is taking appropriate measures to address the COVID-19 pandemic and the risk resulting from the COVID-19 pandemic also exists generally in the community. Courts in this District, including this Honorable Court, have denied motions for release based on COVID-19 where the detention facility is prepared for the virus and the defendant

---

[2] The Defendant does not have a right to a hearing regarding temporary release. *See, e.g., Green*, Criminal No. 19-85, Doc. No. 46, at 2; *Colaianni*, Criminal No. 19-352, Doc. No. 40, at 2.  The Court can render its decision based on the parties' submissions and the record of the detention hearing.  *Id.*

could also be exposed to the disease in the community. Moreover, Courts in this District, including this Court, have denied such motions, even where the defendant has a documented serious health concern, which may increase the risk associated with COVID-19.

29.     Here, the Defendant has not been diagnosed with COVID-19 and the ACJ, where he is currently housed, has taken significant steps to help stop the spread of the disease. Moreover, there is a substantial risk of exposure to COVID-19 in the general community in the Western District of Pennsylvania. The Defendant offers no explanation as to how being on house arrest/conditions of release would be less risky than staying in a facility that is well-equipped to deal with the virus. As the court in *Clark* explained:

> Mr. Clark also does not address the extent to which his risks could be exacerbated if he returns to Chicago. He proposes home detention with GPS monitoring. However, he offers no evidence to explain how living with his mother mitigates the risk of infection. For example, he does not explain who else has or will live in or frequent the home or identify any screening practices or concrete COVID-19 precautions being taken there. He therefore offers nothing more than speculation that home detention would be less risky than living in close quarters with others at CoreCivic, which at least has screening practices and other reasonable COVID-19 precautions in place. . . . And he does not address, once there, the Chicago health care system's capacity to provide him with adequate treatment if he were to contract the virus. In contrast, if he remains at CoreCivic he has access to around-the-clock medical care, the facility is staffed and trained to contain or treat the virus if necessary, and it collaborates with government partners and health agencies to keep its employees and those in its care safe and healthy.

*Clark*, 2020 WL 1446895, at *6.

30.     Although the Government does not contest that the Defendant suffers from the health concerns listed in his motion, the mere fact that he has been diagnosed with these pre-existing conditions does not warrant the relief sought. The Defendant suffered from these conditions even prior to the emergence of the COVID-19 outbreak. He has not suggested that the ACJ is not properly caring for his pre-existing conditions and he never raised with this Court any

concerns regarding ACJ's treatment of his medical conditions. Moreover, he has failed to demonstrate that his needs will not be met while detained or that the ACJ's precautionary measures regarding the COVID-19 virus are insufficient. *See Green*, Criminal No. 19-85, Doc. No 46, at 3.

31.     The fact that defense counsel is barred from having in-person visits with the Defendant due to COVID-19 prevention measures also does not compel the relief requested by the Defendant. The Defendant has not set forth any facts to show that he has had difficulties communicating with his attorney through means other than face-to-face visits. As described above, attorneys and clients can communicate via confidential telephone calls at the ACJ. In addition, written correspondence is also a viable method of communication. And, the ACJ offers confidential video conferencing for inmates and their attorneys. Nine rooms at the ACJ are dedicated to video conferencing, and the ACJ has allocated three officials to assist with said conferencing. These forms of communication are sufficient, especially given that the Defendant's pretrial motions are not due until June 1, 2020, and the United States District Court for the Western District of Pennsylvania has already stated that 'the period of time from March 13, 2020 to April 27, 2020 is considered to be excluded time in all criminal proceedings in this Court pursuant to U.S.C. § 3161(h)(7)(A).' *See* Misc. No. 2:20-mc-394- MRH. Courts in this District have rejected the notion that the measures put into place at detention facilities to prevent the spread of COVID-19 so severely impact the attorney-client relationship that release from detention is warranted. S*ee, e.g.*, *Green*, Criminal No. 19-85, Opinion, Doc. No. 46, at 3; *Saxton-Smith*, Criminal No. 19-190, Doc. No. 352, at 3.

32.     Releasing the Defendant to house arrest, as he suggests, would be particularly inappropriate here, based upon the Defendant's conduct in this case, as he is charged with

distributing drugs from his home/businesses. The Defendant's release would also result in increased danger and an unwarranted burden on the U.S. Probation Office, as the Defendant would be added to the number of pretrial defendants the Probation Office is already actively supervising. In addition, the Defendant's "proposed release plan would place pretrial services officers at risk in supervising him and, if and when the temporary release inevitably ends (whether because the COVID-19 risks subside or because he violates his bond), it will place the USMS officers at risk in re-apprehending him and the facility at risk when he eventually reenters it after having had abundant opportunity for contamination." *Clark*, 2020 WL 1446895, at *8.

33.     Moreover, were the Court to release the Defendant based upon the general arguments set forth in his motion, the Court would be flooded by appeals of defendants similarly seeking pretrial release. Each defendant would make the generic argument, now being made by Defendant David Francis, that he should be released because of the COVID-19 outbreak. If the Court were to find that the COVID-19 outbreak provides sufficient justification for release from detention, hundreds of defendants who have been detained pursuant to orders issued by Judges in this District in order to protect the community *from them*, would be released back onto the streets. Senior Judge Ambrose recognized these concerns in *Jackson*, reasoning that "Certainly, if I were to entertain this request, many other defendants would flood the courts with similar requests.   I also must keep in mind the substantial burden that releasing Defendant and similarly-situated defendants would place on the U.S. Probation Office at a time when conditions already are not conducive to such monitoring." *Jackson*, Criminal No. 18-216, Doc. No. 237, at 4.

34.     The speculative prospect of a COVID-19 outbreak at the ACJ does not diminish the public interest in keeping dangerous defendants off the streets.   In light of the protective

measures now in place at ACJ, the specter of a COVID-19 outbreak should not be used by defendants like David Francis as a mechanism to seek release from incarceration. The continued detention of the Defendant is necessary to ensure public safety and does not endanger public health.

35.    Notably, since the detention hearing held before this Court, there have been changes to the factors set forth at 18 U.S.C. § 3142(g) which only weigh ***more heavily in favor*** of detention. Two months after the detention hearing proceedings in December 2017, on February 28, 2018, the grand jury returned a Superseding Indictment, charging the defendant with additional offenses, including three counts of distribution of heroin/fentanyl resulting in serious bodily injury[3]. (*See* Doc. No. 77.) The return of the Superseding Indictment impacts the factors set forth at 18 U.S.C. § 3142(g), particularly the nature and circumstances of the offense (§ 3142(g)(1)), the weight of the evidence against the defendant (§ 3142(g)(2)), and the nature and seriousness of the danger to the community posed by the Defendant's release (§ 3142(g)(4)). With the return of the Superseding Indictment and the violations charged therein, the factors set forth at 18 U.S.C. § 3143(g) now weigh even more heavily in favor of the Defendant's continued detention. Contrary to the

---

[3] The Superseding Indictment charges defendant David Francis with six counts: (1) conspiracy to possess with intent to distribute and distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 846; (2) possession with intent to distribute and distribution of heroin resulting in serious bodily injury, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (3) possession with intent to distribute and distribution of fentanyl resulting in serious bodily injury, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (4) possession with intent to distribute and distribution of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (5) possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (6) possession with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

Defendant's assertion that he "is not accused of a crime of violence in the traditional sense", the grand jury has charged him with causing "serious bodily injury" to three individual victims along with other serious offenses.

36.      The risks poses by the COVID-19 pandemic do not outweigh the original reasons for detention in David Francis's case. *See, e.g.*, *Green*, Criminal No. 19-85, Opinion, Doc. No. 46, at 3 ("In other words, Green's current arguments for release do not outweigh the factors considered by the magistrate judge in ordering his detention."); *Crute*, Criminal No. 19-299, Doc. No. 37, at 3 ("Crute's current arguments for release do not outweigh the factors considered by Magistrate Judge Kelly in ordering his detention."); *Jones*, Criminal No. 19-249, Doc. No. 50, at 6 ("given the Court's finding that no condition or combination of conditions will reasonably assure the safety of the community if Defendant were released, the Motion to Reconsider Detention Order will be denied"); *Jackson*, Criminal No. 18-216, Doc. No. 237, at 4 ("although Defendant's health conditions rightfully are of concern, and the COVID-19 pandemic is, as the Government describes, extraordinary, these factors do not outweigh the factors discussed above and considered initially by Magistrate Judge Mitchell in ordering that Defendant continue to be detained"); *United States v. Harris*, Criminal No. 18-152, Doc. No. 986, at 5 (W.D. Pa. Mar. 20, 2020) (J. Schwab) ("while Defendant's health conditions are of concern, and the pandemic of COVID-19 is, as the Government appropriately describes, extraordinary, these factors do not outweigh the factors discussed and addressed by both Magistrate Judge Kelly and this Court findings that detention was, and remains, warranted"). Because the general risks posed by the COVID-19 pandemic do not outweigh the factors considered by this Court in ordering the Defendant's detention, he should remain detained pending his trial in this case.

## III.    CONCLUSION

For the foregoing reasons, the Defendant's motion should be denied.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney


*s/Tonya Sulia Goodman*
TONYA SULIA GOODMAN
Assistant United States Attorney
Tonya.goodman@usdoj.gov
PA ID No. 204724